UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSHUA AARON HOLLAMON,<br><br>    Plaintiff,<br><br>v.<br><br>CITY OF LOS ANGELES et al.,<br><br>    Defendants. | Case No. 2:22-cv-08778-SB-MAR<br><br>ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 32] |

  In 2020, Plaintiff Joshua Hollamon brought two stencils and four cans of washable spray chalk into the driveway of the North Hollywood station of the Los Angeles Police Department (LAPD).  After Hollamon had spray-chalked about nine stencils on and around the base of the police station sign and started a tenth, three police officers exited the station, approached Hollamon, and instructed him to put the spray can down.  Officer Shawn Smith stepped away from Hollamon and looked at the stencil that had been applied to the base of the police sign, which was about the size of a sheet of paper, and which read in bright blue chalk: "BLACK LIVES MATTER."  Immediately, Officer Smith grabbed Hollamon's arm and began placing him in handcuffs with the assistance of his fellow officers.  The officers arrested Hollamon for felony vandalism and for resisting arrest.  He was detained in a holding cell for part of a day before being released on his own recognizance.  After Hollamon completed a pre-plea diversion program, all charges were dismissed.

  Hollamon sued the City of Los Angeles, its police chief, and three police officers for violations of 42 U.S.C. § 1983 and state law, alleging retaliation for exercise of his First Amendment rights, false arrest, malicious prosecution, and other wrongdoing.  Defendants move for summary judgment.  Dkt. No. 32.  Because there was probable cause to arrest Hollamon and he has not provided

evidence to support his theories of liability not barred by probable cause, the Court grants summary judgment on all of Hollamon's claims.

I.

The relevant context for Hollamon's claims begins before he entered the driveway of the North Hollywood LAPD station in early December 2020. Days earlier, children from the neighborhood had placed some Thanksgiving-themed art—turkeys constructed from pinecones, leaves, and googly eyes—on the elevated concrete base of the North Hollywood police station sign. Joint Appendix of Evidence (JAE)[1] 10 at 4–5. And months earlier, in the wake of George Floyd's death, LAPD officers had been engaged to help maintain order during protests involving thousands of Black Lives Matter protestors. JAE 23, Smith Depo. 87:14–17. One of those officers was Defendant Officer Shawn Smith, who witnessed some of the protestors set two police cars on fire (one of which exploded within 30 feet of Officer Smith) and attempt to forcibly remove his female partner from her car. *Id.* at 87:17–24. A protestor also hit Officer Smith in the head with a brick. *Id*.

On December 2, 2020, Hollamon approached the North Hollywood police station, which was then closed to the public, and used stencils to spray-chalk "BLACK LIVES MATTER" and "ALL POWER TO THE PEOPLE" ten times in bright blue chalk on the concrete base of its sign and on the adjacent sidewalk and driveway. JAE 10 at 2–3. LAPD officers inside the station saw him. Joint Appendix of Facts (JAF)[2] 4, Dkt. No. 32-2; JAE 10. Officer Smith, Officer Greg

---

[1] To the extent the Court relies on evidence to which an evidentiary objection was raised, the Court overrules the objection, having found the contents of the evidence could be admitted at trial. *See, e.g.*, Sandoval v. County of San Diego, 985 F.3d 657, 666 (9th Cir. 2021) ("If the contents of a document can be presented in a form that would be admissible at trial . . . the mere fact that the document itself might be excludable hearsay provides no basis for refusing to consider it on summary judgment."). To the extent the Court does not rely on evidence objected to by the parties, the objections are overruled as moot.

[2] Unless otherwise indicated, citations to the JAF are to undisputed facts, to the undisputed portions of partially disputed facts, or to the portions of disputed facts that do not appear to be genuinely in dispute based on the stated dispute. *See* Dkt. No. 19 at 6 ("If a party disputes a fact in bad faith by offering evidence that does not contradict the proffered fact *or* by failing to provide a specific citation to the

McDonald, and Lieutenant Peter Gillies—each named as individual defendants—exited the station and approached Hollamon. JAF 4. One of them told him to "put the spray can down." JAF 50. Officers McDonald and Smith approached Hollamon and asked him what he was doing, and Hollamon replied, "I'm just doing some art like these children did." JAF 51–53; JAE 14 at 0:00:14–21.[3] Officer Smith walked over to the base of the sign and viewed the stenciled messages. JAF 54, 56. He immediately walked back to Hollamon and grabbed his left arm, which was still holding the spray can, and began placing it behind his back, telling him, "You're under arrest." JAF 56. Officers Smith and McDonald then began to handcuff Hollamon, which took over a minute, while Hollamon moved his arms around and uttered expletive-laden verbal protests. JAE 14 at 0:00:27–0:01:25. During this process, Hollamon attempted to point to the pinecone animals, stating "Do you see this temporary art here? Mine is also temporary art." JAE 14 at 0:00:47–51. Eventually, Officer Smith picked up the spray can and told Hollamon, "You're not allowed to do anything like this without asking us. You understand that?" JAF 62. Gesturing to the children's art, Officer Smith continued, "They asked to do this. If you would've asked us to this—Power to the People, Black Lives Matter—no, you're not allowed to spray stuff like that on our station." JAF 62–63. Lieutenant Gillies then interjected to tell Officers Smith and McDonald to pat Hollamon down and take him inside. JAF 63. When Hollamon began to say something else, Officer Smith interrupted, "Black Lives Matter's not art. They're a bunch of terrorists anyway." JAF 63. Shortly thereafter, Officer Smith again stated, "Yeah, they're a bunch of terrorists," and asked Hollamon how much he paid for his haircut. JAF 65.

---

supporting evidence, the Court will deem the fact undisputed for purposes of the motion.").

[3] The interaction was recorded on the body-worn camera (bodycam) of Lieutenant Gillies, lodged as Exhibit 14, which the court relies on where facts are disputed or omitted from the JAF. *See Scott v. Harris*, 550 U.S. 372, 381 (2007) (explaining that when an incident is captured on video that blatantly contradicts one side's story, the court on summary judgment should view the facts "in the light depicted by the videotape"); *Hughes v. Rodriguez*, 31 F.4th 1211, 1218 (9th Cir. 2022) ("[F]or purposes of ruling on a motion for summary judgment, a district court may properly view the facts in the light depicted by bodycam footage and its accompanying audio, to the extent the footage and audio *blatantly* contradict testimonial evidence.").

Hollamon was arrested for felony vandalism in violation of California Penal Code § 594(b)(1). JAE 2 at 1. He was taken to the Van Nuys jail facility, where he was seen by medical staff, JAF 37, and released on his own recognizance after midnight, JAF 9; JAE 3. At some point after his release, Hollamon suffered an infection in the area behind his left ear.[4] JAE 37. In June 2021, he was charged with misdemeanor vandalism. JAF 12. After Hollamon stipulated to liability and completed a pre-plea diversion program, JAF 14, the court dismissed the charges against him, JAE 4 at 6.

In December 2022, Hollamon filed this lawsuit against the City of Los Angeles, LAPD Police Chief Michel Moore, Lieutenant Gillies, and Officers Smith and McDonald. Dkt. No. 1. In his First Amended Complaint (FAC), Hollamon alleges the following claims: (1) violation of 42 U.S.C. § 1983 by Officers Smith, McDonald, and Lieutenant Gillies; (2) municipal liability under § 1983 against the City and Chief Moore; (3) supervisory liability under § 1983 against Lieutenant Gillies; (4) violation of California's Bane Act, Cal. Civ. Code § 52.1; (5) false arrest and imprisonment; (6) negligence per se; and (7) negligence. Dkt. No. 5. Defendants move for summary judgment on all claims. Dkt. No. 32.

II.

Summary judgment is appropriate where the record, taken in the light most favorable to the opposing party, shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also* *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. The moving party has the initial burden of establishing that there are no disputed material facts. *Id.* at 256. "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may . . . consider the fact undisputed." Fed. R. Civ. P. 56(e)(2). Furthermore, "Rule 56[(a)] mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

---

[4] According to Hollamon, he became aware of a wound behind his ear while in the lockup facility, and it became infected thereafter. JAE 26 & 37.

A court "may limit its review to the documents submitted for the purposes of summary judgment and those parts of the record specifically referenced therein." *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1030 (9th Cir. 2001). Arguments based on conjecture or unfounded belief do not raise a genuine issue of material fact. Moreover, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *R.W. Beck & Assocs. v. City of Sitka*, 27 F.3d 1475, 1481 n.4 (9th Cir. 1994) (citing *Anderson*, 477 U.S. at 249).

III.

Hollamon asserts claims under § 1983 for multiple constitutional violations. Before considering the claims on the merits, the Court briefly addresses a threshold challenge to these claims.

A.

As a threshold matter, Defendants assert that Hollamon cannot bring a claim for any constitutional violations because under *Heck v. Humphrey*, 512 U.S. 477, 486–87 (1994), his pre-plea stipulation to liability precludes recovery under § 1983. However, a bar under *Heck* "requires an actual judgment of conviction, not its functional equivalent." *Duarte v. City of Stockton*, 60 F.4th 566, 571 (9th Cir. 2023) (finding no *Heck* bar where plaintiff had pled nolo contendere but the charges were dismissed before conviction pursuant to an informal-diversion agreement), *cert. denied,* 143 S. Ct. 2665 (2023). Hollamon's stipulation was part of a pre-plea diversion program under California Penal Code § 1001.95. JAE 4 at 4. Because the stipulation does not constitute an actual judgment of conviction, Hollamon is free to pursue his § 1983 claims.

B.

Hollamon claims that his arrest, detention, and prosecution resulted in the following constitutional violations: (1) unlawful arrest in violation of the Fourth Amendment and malicious prosecution in violation of the Fourteenth Amendment, (2) excessive force in violation of the Fourth Amendment, (3) retaliation in violation of the First Amendment, and (4) failure to provide medical care while he was in custody in violation of the Fourteenth Amendment.[5] Hollamon alleges all

---

[5] Hollamon's FAC refers to his "First, Fourth, and Fourteenth Amendment rights to be free from false arrest, unreasonable force, malicious prosecution, abuse of

these theories in a single cause of action against Officers Smith and McDonald and Lt. Gillies in Count 1, and then alleges municipal liability for the same violations in Count 2 and supervisory liability against Lt. Gillies in Count 3.

1.

Hollamon's claims for unlawful arrest and malicious prosecution both hinge on his contention that the officers lacked probable cause to arrest him and are thus considered together.

Probable cause exists "when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007). The rule is satisfied if, "under the totality of the circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that the defendant had committed a crime." *Id*. (cleaned up). "Because probable cause is an objective standard, an arrest is lawful if the officer had probable cause to arrest for any offense, not just the offense cited at the time of arrest or booking." *District of Columbia v. Wesby*, 583 U.S. 48, 54 n.2 (2018).

Where probable cause exists, there is no constitutional violation for unlawful arrest under the Fourth Amendment, regardless of the officer's subjective motivations. *Tatum v. City & Cnty. of San Francisco*, 441 F.3d 1090, 1094 (9th Cir. 2006). Probable cause likewise forecloses a plaintiff from bringing a § 1983 claim based on malicious prosecution. *Lassiter v. City of Bremerton*, 556 F.3d 1049, 1054 (9th Cir. 2009) ("[P]robable cause is an absolute defense to malicious prosecution.").

---

process, violation of due process and equal protection rights, and retaliation based upon protected speech." FAC at 5. The due process and equal protection claims are based on the same allegations underlying the false arrest, unreasonable force, malicious prosecution, and retaliation claims. *E.g.*, FAC ¶ 19 ("This selective enforcement violates plaintiff's right under the Fourteenth Amendment to equal protection of the laws."). Accordingly, the Court analyzes the alleged "abuse of process" claim as part of the malicious prosecution claim and addresses the due process and equal protection allegations as part of his claims for malicious prosecution and failure to provide medical care.

Hollamon was arrested for felony vandalism. Section 594(a) of the California Penal Code states:

> Every person who maliciously commits any of the following acts with respect to any real or personal property not his or her own, in cases other than those specified by state law, is guilty of vandalism:
>
> (1) Defaces with graffiti or other inscribed material. . . .

Cal. Penal Code § 594(a)(1). If the "amount of defacement" is $400 or more, or if the defendant has previously been convicted of vandalism, the violation is a felony; otherwise, it is a misdemeanor. *Id.* §§ 594(b)(1), (b)(2)(A)–(B).

The arresting officers witnessed Hollamon spraying chalk stencils on and around the base of the police department's sign at the police station. Spraying chalk letters on someone else's property is defacement that violates the vandalism statute. *See In re Nicholas Y.*, 85 Cal. App. 4th 941, 943 (2000) (discussing revision of Cal. Penal Code § 594 to include chalk). That the substance was allegedly easily removable does not render it legal under § 594. *Id.* at 944. ("[A] marring of the surface is no less a defacement because it is more easily removed."). Thus, the officers witnessed a crime occurring in their presence on police property.

Hollamon does not seriously argue that his chalk messages did not violate § 594; instead, he argues the police should have exercised their discretion not to arrest him for it, and that he should not have been charged with a felony.[6] He contends that the cleanup costs for his graffiti did not exceed $400 and that Defendants' after-the-fact billing to support the costs was a sham. At the time of his arrest, the City's Graffiti Removal Cost Sheet, included with the arrest report, estimated removal costs for graffiti depending on the location. JAE 2 at 8. The sheet estimates $425 to remove graffiti from sidewalks or barriers like retaining walls and $475 to remove it from a street. *Id.* Thus, the officers, who observed him graffiti ten messages on their barrier and driveway and on the adjacent sidewalk, had probable cause to believe Hollamon had committed a felony. But even if Hollamon were right that the officers did not have a valid basis to believe the cleanup costs would exceed $400, his claims still fail because the officers

---

[6] Hollamon also summarily alleges that the statute is vague and overbroad, FAC ¶¶ 22–23, but he has not developed this argument and appears to have abandoned it at summary judgment.

plainly had probable cause to arrest him at least for misdemeanor vandalism.[7] *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender.") Hollamon's claims for § 1983 violations based on unlawful arrest and malicious prosecution accordingly fail.

2.

Hollamon next claims that the officers used excessive force in violation of his Fourth Amendment rights.

Whether a use of force was excessive hinges on whether it was "objectively reasonable in light of the facts and circumstances" confronting the officers at the time. *Lombardo v. City of St. Louis, Missouri*, 141 S. Ct. 2239, 2241 (2021) (per curiam) (cleaned up). These facts and circumstances include "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id*. (cleaned up). An officer is entitled to use some degree of physical coercion when making an arrest, even if the suspect does not actively resist and does not present an immediate security threat. *Demarest v. City of Vallejo, California*, 44 F.4th 1209, 1226 (9th Cir. 2022).

Hollamon contends that if the officers were conducting a *Terry* stop, then the handcuffing was excessive; and, alternatively, if the officers were conducting an arrest, then the arrest was excessive because it lacked probable cause. Because the officers had probable cause to arrest Hollamon, this argument fails on its own terms. In any event, Hollamon cannot show that the use of force was unreasonable in light of the bodycam footage depicting the arrest. Officers Smith and McDonald used some degree of force: they grabbed plaintiff's arms, moved them behind his back, and placed handcuffs on him shortly after Hollamon bent over onto the base of the sign. During the arrest, Hollamon was plainly offering some degree of

---

[7] Hollamon argues that "a factfinder could reasonably conclude that the officers, when they charged Hollamon with felony vandalism, knew that they were overcharging [him]." Dkt. No. 32-1 at 40. It was the prosecutor (who is not a defendant), not the arresting officers, who charged Hollamon, and in any event, Hollamon was charged only with misdemeanor vandalism.

resistance, attempting to move his arms around, cursing at the officers, and at one point removing his arm from behind his back and pointing at the pinecone art. Since the law authorizes the use of "a reasonable level of force to effectuate an arrest," *Luchtel v. Hagemann*, 623 F.3d 975, 980 (9th Cir. 2010), Hollamon's claim for excessive force fails.

### 3.

Hollamon's First Amendment claim is legally more challenging. He alleges that the officers unconstitutionally retaliated against him for exercising his First Amendment rights.

A plaintiff claiming First Amendment retaliation must show that he engaged in protected conduct, that an official took an adverse action against him, and that the official's retaliatory animus was the "but-for" cause of the plaintiff's injury. *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019). The Supreme Court has held that probable cause is "generally" a bar to retaliatory arrest claims. *Id.* at 1727. In *Nieves*, Plaintiff Bartlett was arrested for disorderly conduct at a sporting event after he had refused to speak with Officer Nieves earlier the same evening. *Id.* at 1720. At the time of the arrest, Bartlett had been drinking, speaking in a loud voice, and standing close to another police officer. *Id.* at 1728. After arresting Bartlett, Officer Nieves allegedly stated, "bet you wish you would have talked to me now." *Id.* at 1721. Bartlett sued, and the district court granted summary judgment for Nieves based on the existence of probable cause. *Id.* at 1721. The Supreme Court rejected Bartlett's First Amendment claim for retaliatory arrest, holding that the existence of probable cause generally bars that claim. *Id.* at 1727–28.

The Supreme Court explained that this general rule, though imperfect, is necessary to allow officers to perform their duties without undue fear of liability. *Id.* at 1723–25. Officers frequently must make "split second" judgments about whether to arrest in "circumstances that are tense, uncertain, and rapidly evolving." *Id.* at 1724 (cleaned up). The inquiry into the cause of the arrest in a retaliation claim is also complicated by the fact that "protected speech is often a wholly legitimate consideration for officers when deciding whether to make an arrest." *Id.* at 1724 (cleaned up). When there is probable cause to arrest, sorting out the subjective motivating factors of the arresting officer to determine the but-for cause of the arrest is difficult and would invite a flood of lawsuits for retaliatory arrest. *Id.* at 1723; *see also Lozman v. City of Riviera Beach*, 138 S. Ct. 1945, 1953 (2018) ("[T]he complexity of proving (or disproving) causation in [retaliatory

arrest] cases creates a risk that the courts will be flooded with dubious retaliatory arrest suits.").

Against this backdrop, the Supreme Court carved out a "narrow" exception to the general rule—"where officers have probable cause to make arrests, but typically exercise their discretion not to do so." *Nieves*, 139 S. Ct. at 1727. The Court gave the example of a police critic arrested for jaywalking at an intersection where jaywalking is "endemic but rarely results in arrest." *Id*. In such a case, the presence of probable cause "does little to prove or disprove the causal connection between animus and injury," and the no-probable-cause requirement "seem[s] insufficiently protective of First Amendment rights." *Id*. A plaintiff can invoke this exception when he "presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Id*.

In the four years since *Nieves*, the Supreme Court has not clarified how much evidence satisfies this burden or what kind of evidence is required to meet it. These questions were debated at the time of the decision. *Compare id*. at 1739 (Sotomayor, J., dissenting) ("The basic error of the Court's new rule is that it arbitrarily fetishizes one specific type of motive evidence—treatment of comparators—at the expense of other modes of proof."), *with id*. at 1734 (Gorsuch, J., concurring) ("I do not understand the majority to have gone that far."). And the debate has continued since. *Compare Gonzalez v. Trevino*, 42 F.4th 487, 192 (5th Cir. 2022) ("The most reasonable reading of this language is that some comparative evidence is required to invoke this 'narrow' exception."), *with id*. at 502 (Oldham, J., dissenting) ("[S]uch *comparative* evidence is not required.") (emphasis in original). The Supreme Court recently granted certiorari on this very question in *Gonzalez*. 2023 WL 6780371 (Oct. 13, 2023).

In the meantime, this Court must do its best to faithfully apply the *Nieves* decision as articulated by the majority. The majority concluded that "the no-probable-cause requirement should not apply when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." 139 S. Ct. at 1727. This passage appears to state several things clearly: (1) the plaintiff bears the burden of production, (2) the evidence must be objective (not subjective), (3) the evidence must involve similarly situated individuals aside from the protected speech, and (4) those individuals must not have been arrested.

10

The Ninth Circuit applied the *Nieves* exception consistent with these requirements in *Ballentine v. Tucker*, when three protestors were arrested for chalking anti-police messages in front of a courthouse. 28 F.4th 54, 60–61 (9th Cir. 2022). In that case, the protestors presented evidence that "other individuals chalking at the courthouse at the same time" as the protestors, and who were not engaged in anti-police speech, were not arrested. *Id.* at 62. Those individuals were undoubtedly similarly situated—they were observed by the police doing the same activity in the same place at the same time as the protestors. The Ninth Circuit held that this met the *Nieves* exception. In contrast, in *Baker v. Clearwater County*, the Ninth Circuit found that a plaintiff, who had been arrested for false imprisonment and for resisting or obstructing a police investigation, had not met the *Nieves* exception when he submitted testimony in which the sheriff stated he was unaware of any similar arrests. No. 22-35011, 2023 WL 3862511, at *2 (9th Cir. June 7, 2023). The panel held that the testimony did not state whether "an analogous circumstance *has ever actually* occurred." *Id.* (emphasis in original). Thus, the plaintiff had not demonstrated "that *similarly situated* individuals not engaged in protected speech avoided arrest when [he] did not—a 'required' showing under *Nieves*." *Id.* (emphasis in original).

The evidence presented by Hollamon in this case does not satisfy the objective standard established in *Nieves*. Relying on statements made by Officer Smith that bear on the arresting officer's *subjective intent*, Hollamon alleges that his arrest "presents the most perfect example of unlawful state retaliation for protected speech and expressive conduct under the First Amendment and *Nieves* as might be imagined." Joint Brief at 1–2. But before Hollamon can reach the question of whether the officers acted with retaliatory motive, he must present objective evidence that he qualifies for the *Nieves* exception. *Nieves*, 139 S. Ct. at 1727 ("Because this inquiry is objective, the statements and motivations of the particular arresting officer are 'irrelevant' at this stage."). Hollamon has not done so. Like the plaintiff in *Baker*, Hollamon's evidence does not establish that "an analogous circumstance *has ever actually* occurred," much less that the police treated the situation differently by choosing not to arrest.

First, Hollamon points to testimony from Gerry Valido, the Assistant Director of the Office of Community Beautification, who regularly testifies in felony vandalism prosecutions about the amount of damage caused. JAF 66. According to Hollamon, Valido could not recall a single prosecution for felony vandalism for chalking, despite being called to testify dozens of times over many years. *Id.* While this evidence may suggest that chalkers rarely face felony vandalism charges that proceed to trial, it provides no evidence that a similar

situation to Hollamon's has ever actually occurred (i.e., the police caught an individual in the act of defacing a police station)[8] and that the police chose not to arrest them.

One need look no further than Hollamon's own arrest to demonstrate the insubstantial nature of his proffered objective evidence. Hollamon himself did not face these charges at trial—he was charged with misdemeanor vandalism and entered a diversion program. So even if the police had encountered people spray-chalking at the same police station before and arrested them, Valido would not have been called to testify in those cases if they were treated like Hollamon. Moreover, Valido's testimony would be the same even if no one ever used chalk to deface property, or if people used chalk but the police never observed them, or if the police observed them but only arrested them for misdemeanor vandalism, or if the police arrested them for felony vandalism but prosecutors chose to charge them with misdemeanor vandalism (as happened here), or if prosecutors charged them with felony vandalism but they pleaded guilty before trial.[9]

Second, Hollamon relies on testimony from Claudia Alvarado, who receives 30 to 100 graffiti cleanup requests from the city per day, and who could not recall any requests to clean up chalk. JAF 66. In the same vein, cleanup employee Sergio Barbosa only remembers cleaning five or so instances of chalk in eight

---

[8] When considering objective evidence of similar circumstances for comparative purposes, a court should bear in mind the purpose of the comparison—namely, to determine whether the officer would have made the arrest in the absence of the protected speech. To be meaningful, this inquiry must take into account the material aspects of the arrest. For instance, while officers generally might not arrest for jaywalking, they certainly might arrest a jaywalker who almost causes a traffic accident. *See Nieves*, 139 S. Ct. at 1727 (tailoring the hypothetical to arrests at "intersections" where "jaywalking is endemic but rarely results in arrest"). As applied here, this principle would seem to require consideration of whether an individual was caught in the act of using chalk to vandalize a police station. But even if this is not the correct comparison, Hollamon's evidence still falls short of the requisite standard. *See* discussion *infra*.

[9] Of course, the vast majority of criminal cases resolve short of trial. Valido's testimony does not account for the large swath of arrests and prosecutions that end in a plea bargain or open plea—which do not require proof of damage caused by the vandalism—and thus say little about the regularity of arresting a vandal for chalking.

years. *Id*. But again, this evidence fails to show the existence of any similarly situated individuals who were not arrested after being caught in the act of defacing a police station with chalk. Alvarado's testimony would be the same if no one ever used chalk to deface a police station, or if a person chalked a police station but the police chose not to contract with Alvarado's organization for the cleanup.

Third, Hollamon offers evidence of other activity near the station where the police took no action: photographs of faint chalk drawings in the public street adjacent to one of the police station entrances, JAE 28; photographs of dirty, broken sidewalks surrounding the police station, JAE 29; and the children's pinecone art, JAE 10. The children who placed pinecone art on the police station sign were plainly not similarly situated to Hollamon, because placing pinecones on a surface does not constitute "defac[ing] with graffiti or other inscribed material" under Cal. Penal Code § 594(a)—so the police would not have had probable cause to arrest the children for vandalism. And while the photographs of chalk demonstrate that someone, at some time, used chalk in an adjacent street, it does not demonstrate that this person was similarly situated to Hollamon—i.e., that he or she was caught in the act of using spray chalk on police station property.

Fourth, and finally, Hollamon points to a municipal ordinance creating a civil fine for graffiti (including chalk). Joint Brief at 27 (citing Los Angeles Municipal Code § 49.84.3). Hollamon argues that the existence of this ordinance indicates that the city "expressly . . . ma[de] the resolution of such matters civil or administrative." Joint Brief at 27. But that conclusion does not follow, because the ordinance expressly states that its purpose is to "protect public and private property from acts of vandalism and defacement"—not to lessen the severity of existing graffiti enforcement laws—and that its fines are "cumulative to" existing criminal punishments (and thus does not replace them). Los Angeles Municipal Code §§ 49.84.1, 49.84.12.

In short, Hollamon has not satisfied his burden to show that individuals engaged in similar conduct, aside from protected speech, are not arrested. None of Hollamon's evidence demonstrates that the police observed someone else chalking on police station property—or anywhere for that matter—and chose not to arrest that person. Accordingly, the *Nieves* rule, rather than its "narrow" exception, applies, and probable cause bars Hollamon's First Amendment retaliation claim.

4.

Hollamon also alleges that Defendants violated his Fourteenth Amendment rights by failing to provide medical care while he was held in the jail cell following his arrest. Hollamon alleges that he discovered a wound behind his ear while in custody and was denied sanitizer or soap to clean it. A pretrial detainee's claim for failure to provide medical care under the Due Process Clause of the Fourteenth Amendment requires that:

> (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

*Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018).

Hollamon's claim is meritless. His contention that the officers injured his ear by pulling his mask down is contradicted by the bodycam footage showing the officers did not touch his face and that his mask fell down on its own, JAE 14, and the medical intake screening conducted at the Van Nuys facility makes no reference to any ear or head injury, JAE 8. Hollamon does assert in his declaration that he learned of the wound behind his left ear "while in the lockup" and "asked jailers for soap or sanitizer several times and, each time, was ignored or denied." JAE 26 ¶ 8. But even if true—and even accepting the medically unsupported assertion that the failure to apply hand sanitizer to his ear caused his subsequent ear infection—he produces no evidence that any Defendant intentionally subjected him to a substantial risk of serious harm (or that such risk was obvious). Defendants are entitled to summary judgment on this claim.

*   *   *

In conclusion, Hollamon has not established a constitutional violation. Consequently, he cannot bring a § 1983 claim against the individual or municipal defendants. *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1145 (9th Cir. 2021) ("The first inquiry in any § 1983 suit is whether the plaintiff has been deprived of a right "secured by the Constitution and laws.") (cleaned up); *Lockett v. Cnty. of Los*

*Angeles*, 977 F.3d 737, 741 (9th Cir. 2020) (claims for municipal liability under § 1983 "require a plaintiff to show an underlying constitutional violation"). Nor does the Court need to address whether the individual defendants are entitled to qualified immunity. *Valdez v. Rosenbaum*, 302 F.3d 1039, 1049 (9th Cir. 2002) (finding it unnecessary to "address whether the defendants were entitled to qualified immunity" after concluding that there was no constitutional violation).

IV.

In addition to his federal claims, Hollamon asserts state-law claims for false imprisonment, Bane Act violations, and negligence. The state-law claims also fail to survive summary judgment.

Two of Hollamon's four state-law claims fail because they depend on his assertion that the arresting officers lacked probable cause. Because an element of a false imprisonment claim under California law is arrest without lawful privilege, the existence of probable cause bars Hollamon's fifth cause of action. *See Young v. Cnty. of Los Angeles*, 655 F.3d 1156, 1170 (9th Cir. 2011) (affirming grant of summary judgment on California false imprisonment claim because probable cause existed). And since Hollamon's cause of action for negligence per se is predicated on a violation of a false arrest statute, FAC ¶¶ 62–64, his sixth claim also fails. *See Salazar v. Upland Police Dep't*, 116 Cal. App. 4th 934, 947 (2004) ("Plaintiff argues that [the existence of probable cause . . . only defeats the . . . false arrest/imprisonment [claim]. We disagree. Summary judgment is also appropriate as to the . . . battery and . . . negligence [claims] since a finding of the absence of probable cause to stop and arrest plaintiff is a prerequisite to both claims.").

Hollamon's Bane Act claim likewise fails because it is premised on the same theory as his § 1983 claims. A Bane Act claim cannot proceed where there is no constitutional violation. *Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1044 (9th Cir. 2018) (describing a constitutional violation as a "predicate" for a Bane Act claim). Hollamon bases his Bane Act claim on the same conduct as his § 1983 claims. FAC ¶ 47. Since the Court has found no constitutional violation, the Bane Act claim fails as well.[10]

---

[10] Although Hollamon includes passing citations to the California Constitution alongside the U.S. Constitution, he does not argue that these rights are in any way different from his federal constitutional rights. Hollamon has thus waived any argument that they are different.

This leaves only Hollamon's seventh cause of action for negligence. He raises three theories in support of this claim. The first—negligent exercise of arrest powers—is alleged against the officers and vicariously against the City, while the second and third—negligent hiring, supervision, and retention, and negligent management of the lockup facility in the Van Nuys station—are alleged only against the City. FAC ¶¶ 69–72.

At least one California court has held that the existence of probable cause bars a negligence claim based on arrest. *Salazar*, 116 Cal. App. 4th at 947 (affirming summary judgment on negligence claim because "a finding of the absence of probable cause to stop and arrest plaintiff is a prerequisite" for the claim). Hollamon does not cite any authority to the contrary, nor does he identify what duty was owed, how it was breached, or how that breach caused him injury. *See Hayes v. Cnty. of San Diego*, 57 Cal. 4th 622, 629 (2013) (discussing elements of negligence claim). Hollamon's claim for negligent exercise of arrest powers—his only claim against the individual officers—therefore fails as a matter of law.

A claim for negligent hiring, supervision, or retention requires the plaintiff to show that the defendant "knew or should have known of the dangerous propensities of the employee who injured the plaintiff." *C.A. v. William S. Hart Union High Sch. Dist.*, 53 Cal. 4th 861, 867, 878 (2012). But Hollamon has not produced evidence that the City knew or should have known that any of its employees was likely to injure him. Nor has he produced evidence (or even argument) in support of his theory that the City negligently managed the Van Nuys lockup facility. *See* Joint Brief at 45–46 (discussing negligence claims). Thus, his negligence claim against the municipal defendants also fails.

Accordingly, Defendants are entitled to summary judgment on Hollamon's negligence claim in Count 7.

V.

Defendants' motion for summary judgment is GRANTED, and Hollamon's claims are DISMISSED on the merits with prejudice.

Date: December 22, 2023

_____
Stanley Blumenfeld, Jr.
United States District Judge